IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CHARLES C. MCPHERSON,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　CASE NO. 3:20-cv-00384
v.　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　JUDGE RICHARDSON
VIGNOBLES SULLIVAN, LLC,　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　　　)

**<ins>MEMORANDUM OPINION</ins>**

Pending before the Court is a motion for summary judgment (Doc. No. 49, "Motion") filed

by Defendant Vignobles Sullivan, LLC. In support of the Motion, Defendant filed a memorandum

of law (Doc. No. 50, "Memorandum") and statement of facts (Doc. No. 51, "Statement of Facts").[1]

Plaintiff filed a response to the Motion (Doc. No. 63, "Response") and responses (Doc. No. 61) to

the Statement of Facts. Defendant thereafter filed a reply in further support of the Motion (Doc.

No. 67, "Reply").

For the reasons stated herein, the Court will **GRANT** the Motion in its entirety.

<ins>LEGAL STANDARD</ins>

Summary judgment is appropriate where there is no genuine issue as to any material fact

and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms,

this standard provides that the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[1] When a specific numbered (alleged) fact set forth in the Statement of Facts is discussed herein, it is referred
to as a "Fact," as in "Fact [number]."

247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56 "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the nonmoving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*.

The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 689 (M.D. Tenn. 2019) (citing *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009)). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. . .. [T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). In addition, "if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322-23); *see also Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (explaining that if the moving party bears the burden of proof at trial that party "must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial." (citing William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477–78 (1992))).

<u>DISCUSSION</u>

This matter stems from an apparently failed business relationship between Plaintiff and Defendant. Plaintiff brings five claims against Defendant via his second amended complaint (Doc. No. 37, "Second Amended Complaint")[2]: (1) retaliation in violation of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 ("TPPA"); (2) breach of contract; (3) promissory estoppel; (4) discrimination in violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA"); and (5) retaliation in violation of the THRA. (Doc. No. 37 at 11-16). Defendant argues that it is entitled to summary judgment on all five claims, primarily arguing that Plaintiff has not presented sufficient evidence to support his claims. (*See generally*, Doc. No. 50). Naturally, whether Plaintiff's claims survive the Motion turns largely on what facts the Court should treat as not in genuine dispute (and thus are effectively established for purposes of the Motion); those facts are laid out in the following paragraphs.

---

[2] The Court recognizes the Second Amended Complaint as the operative complaint and thus treats it as the document setting forth Plaintiff's claims that are currently pending and subject potentially to summary judgment. Filings in the pleading phase prior to the Second Amended Complaint bear no impact on the Court's determination on the Motion, and so the Court herein will not discuss them.

Via his responses to the Statement of Facts, Plaintiff admits that various *material*[3] facts

asserted by Defendant are undisputed[4] for purposes of summary judgment.[5] Those material facts,

and Defendant's citations in support of them, are set forth below verbatim[6] (except to the extent

indicated in footnote 6 hereto),[7] albeit with one footnote appended to them (footnote 8 herein):

> 17. After the third meeting, Sullivan[8] offered Plaintiff the job[9] via e-mail.
> (Pl.'s Dep. at 38).

---

[3] As discussed above, a fact is "material" within the meaning of Rule 56 "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. Under Local Rule 56.01 (c), "[t]he movant must file a concise, non-argumentative statement of the alleged undisputed material facts (not legal conclusions, arguments, or characterizations) that the movant contends supports summary judgment." L.R. 56.01(c). By providing 132 Statements of Fact, filed pursuant to Rule 56 and Local Rule 56.01(c), Defendant indicates to the Court that it must find all 132 Statements of Fact are not in genuine dispute. Put another way, if any one of the 132 Statements of Fact—that according to Defendant, all material—are in genuine dispute, then Defendant is not entitled to summary judgment.
    There are several facts that cannot be material for the purposes of summary judgment. (*See e.g.*, Doc. No. 51 at ¶¶ 3, 5, 6, 11, 14). Realizing that Defendant most likely provides several (immaterial) facts for the purpose of "setting the stage," as many attorneys do in drafting a statement of facts, the Court includes herein the Facts that it deems material for purposes of summary judgment.

[4] For purposes of summary judgment, what actually matters is not what facts are (or are not) "undisputed" but rather what facts are (or are not) in genuine dispute. It is possible for a fact to be disputed and yet not be in *genuine* dispute; a party does not raise a genuine dispute by presenting a disingenuous (or otherwise patently hollow) dispute. The facts stated here are called "undisputed" by the Court because, for the reasons set forth before, it is appropriate to treat them as undisputed. To the extent that Plaintiff would now claim that he intended to dispute any of these facts, such dispute would not in the view of the Court be genuine anyway. So although the Court herein uses the concise term "undisputed" for ease of reference, it does so intending that the term mean "not in genuine dispute."

[5] That is not to say that Plaintiff admits the *materiality* of all these facts; Plaintiff expressly disputes the materiality of several of them.

[6] The Court altered some of the citations to reflect the location of the documents within the docket of this case. Additionally, some references to the names of parties have been changed to foster cohesiveness and uniformity. Substantively, however, the quotation of the facts from Defendant's Statement of Facts (Doc. No. 51) is verbatim, albeit with the Court having added bracketed material in two places for purposes of clarification.

[7] Moreover, when citing a document, the Court herein consistently cites the docket number of the document in this case along with the applicable page number within that document (as in "Doc. No. __ at __," as opposed to citing the PageID#), eschewing the differing citation formats used by the parties.

[8] According to Plaintiff's second amended complaint (Doc. No. 37, "Second Amended Complaint"), "Sullivan" refers to Tom Sullivan, the owner of Defendant. (Doc. No. 37 at ¶ 7). The Court likewise uses "Sullivan" when referring to Tom Sullivan.

20. Plaintiff's employment started on January 2, 2019. (Pl.'s Dep. at 15-16).

34. Plaintiff reviewed the [Employment] Agreement[10] immediately and his initial impression was the parties were "very close" to a mutual understanding. (Pl.'s Dep. at 50-51).

35. On February 15, 2019, Plaintiff replied to Sullivan's e-mail with the following: '[e]verything looks good – exactly as we discussed with only one exception. The vesting – the total number is right at 10% at ten years, but I thought we had said 3% vested in three years and the remaining 7% after completion of ten years. It currently reads 5% after five years and the remainder at the end of ten. It's a minor difference . . ." (Exhibit 7 to Pl.'s Dep.).

37. Plaintiff admitted that any vesting to which he was allegedly entitled was contingent on his continued employment. (Pl.'s Dep. at 54, 61-62).

39. Plaintiff admitted that the parties never reached a "meeting of the minds" on this contract. (Pl.'s Dep. at 59)

43. On November 2, 2019, Plaintiff sent a lengthy email to Sullivan containing his proposed edits to the [Employment] Agreement. (Pl.'s Dep. at 68; *See* Exhibit 9 to Pl.'s Dep).

44. Plaintiff's proposed edits to the [Employment] Agreement were substantial, and included a proposed pay increase, clarification on which markets were subject to the $15,000 and $5,000 commissions, increased vacation, and clarifying language on when vesting would occur and at what percentages. (Pl.'s Dep. at 68-71; *See* Exhibit 9 to Pl.'s Dep).

45. Plaintiff also proposed three new paragraphs requesting that he 1) "be involved in all aspects of hiring, developing, and when necessary terminating employees"; 2) "be offered right of first refusal on sale of any vineyard . . ."; and 3) "should ownership decide to sell before employee reaches full vested ownership of 10%, ownership shall pay employee 10% value of sale price." (Exhibit 9 to Pl.'s Dep.).

47. Plaintiff admitted that neither party signed any employment agreement with his proposed edits. (Pl.'s Dep. at 72).

---

[9] Presumably, the "job" referred to within this Fact refers to Sullivan offering Plaintiff the role of President of Defendant. (Doc. No. 37 at ¶¶ 7, 11).

[10] For ease of understanding, the Court shall refer to the employment agreement, dated February 2019 (and unsigned by the parties) as the "Employment Agreement" throughout this order. (*See* Doc. No. 52-2 at 2-6.)

48. Neither Plaintiff nor Vignobles ever signed a valid and enforceable employment agreement. (Pl.'s Dep. at 57-58, 72).

57. Plaintiff admitted he was not employed for one year. (Pl.'s Dep. at 76).

61. Plaintiff admitted any vesting was contingent on his continued employment for a minimum of three years, which did not occur. (Pl.'s Dep. at 53-54, 61-63, 75-76).

63. The February 14, 2019 proposed [Employment] Agreement explicitly provided Plaintiff's employment was to be considered at-will. (Pl.'s Dep. at 56-67).

68. Plaintiff testified that he had "several leads" and his "opportunities were many" during this five-month period of unemployment between Jam Cellars and Vignobles. (Pl.'s Dep. at 31).

69. These "opportunities" were not pending job offers, but simply places Plaintiff speculated he could get employment if he tried given his experience in the industry and self-described status as a "profit center." (Pl.'s Dep. at 31).

70. Plaintiff admitted no formal offers of employment from any other entities existed at the time he accepted Vignobles' oral offer of employment. (Pl.'s Dep. at 31-32, 43).

72. At no point did Plaintiff request that the at-will employment language of his [Employment] Agreement be revised to provide guaranteed employment of at least ten years. (Sullivan Decl. at ¶ 9).

74. As late as November 2, 2019, Plaintiff was still attempting to negotiate substantial portions of the draft [Employment] Agreement. (Pl.'s Dep. at 67, 71-72; *See* Exhibit 9 to Pl.'s Dep.).

75. During Plaintiff's employment, Vignobles employed at most four (4) individuals at once. (Sullivan Decl. at ¶ 5).

79. Plaintiff testified that Sullivan did not mention anything about Plaintiff's age during his termination, only that his employment was not working out. (Pl.'s Dep. at 143, 145).

95. Plaintiff's stated issues with Gabriella[11] were three-fold; 1) Plaintiff secured an exclusive contract in California with Phenix Distributing Company and Gabriella's continued sales of Vignobles' wine there violated that contract; 2) potential federal and/or state rules at issue if Gabriella held Vignobles' wine without

---

[11] Gabriella is a wine importer and distributor that distributed Defendant's wines in California and Florida. (Doc. No. 37 at ¶ 28).

permission; and 3) Gabriella was dumping inventory and selling Vignobles' wine way off its price strategy. Plaintiff also stated that Gabriella "undermine[ed] his authority." (Pl's Dep. at 123-124, 132-33, 135-36).

112. During Plaintiff's employment, he spent an excessive amount of money on Vignobles' credit card for non-business-related expenses. These expenses included, but are not limited to, dinners with his wife, flights purchased for his wife, frequent flights to Atlanta, stays at fancy hotels, spa trips, grocery expenses, and rental car purchases and rideshare purchase on the same trip. (Pl's Dep. at 184-85; Sullivan Decl. at ¶¶ 14, 17).

(Doc. No. 61).[12]

## I.  Count 1: Alleged Violation of TPPA

The TPPA "prohibits the discharge or termination of an employee for refusing to participate in or for refusing to remain silent about illegal activities." *Gore v. Chardonnay Dialysis, Inc.*, No. 3:11-CV-00808, 2012 WL 3552882, at *6 (M.D. Tenn. Aug. 16, 2012) (quoting *Harman v. Univ. of Tenn.*, 353 S.W.3d 734, 735 (Tenn. 2011)). The TPPA creates a cause of action for retaliatory discharge by providing that:

> (b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
>
> …
>
> (d)(1) Any employee terminated in violation of subsection (b) *shall have a cause of action* against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn. Code Ann. § 50-1-304(b) & (d)(1) (emphasis added); *Webb v. Nashville Area Habitat for Human., Inc.*, 346 S.W.3d 422, 437 (Tenn. 2011).

The availability of a retaliatory discharge claim under the TPPA extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated. *Williams*

---

[12] Above, where reference is made to "Plaintiff [having] admitted" something, the "admi[ssion]" was made by Plaintiff during his deposition.

*v. Greater Chattanooga Public Tele. Corp.,* 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011) (citing

*Mason v. Seaton,* 942 S.W.2d 470, 472 (Tenn. 1997)).

The Tennessee Supreme Court has held that a *modified* version of the so-called *McDonnell Douglas* framework applies to TPPA retaliation claims.[13] *Gammons v. Adroit Med. Sys., Inc.*, 91 F.4th 820, 829 (6th Cir. 2024) (citing *Williams*, 465 S.W.3d at 111). For a claim of retaliation under the TPPA, Tennessee's burden-shifting framework operates as follows:

> In any civil cause of action for retaliatory discharge brought pursuant to this section, or in any civil cause of action alleging retaliation for refusing to participate in or remain silent about illegal activities, the plaintiff shall have the burden of establishing a prima facie case of retaliatory discharge. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one [ ] or more legitimate, nondiscriminatory reasons existed for the plaintiff's discharge. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the plaintiff's discharge and that the stated reason was a pretext for unlawful retaliation. . . . The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of unlawful retaliation.

*Richmond v. Vanguard Healthcare Servs., LLC*, No. M201402461COAR3CV, 2016 WL 373279, at *4 (Tenn. Ct. App. Jan. 29, 2016) (citing Tenn. Code Ann. § 50–1–304(f)). Notably, this standard modifies the (federal) *McDonnell Douglas* standard by making the standard "more stringent" for plaintiffs by "requir[ing] the plaintiff to show that unlawful retaliation was the *sole* reason for the termination," *Gammons*, 91 F.4th at 829  (emphasis added) (citing Williams v. City of Burns, 465 S.W.3d 96, 111–12 (Tenn. 2015)), whereas (at least according to the implication in *Gammons*) that

---

[13] The TPPA itself requires the application of the modified *McDonnell Douglas* burden-shifting framework to claims accruing on or after June 11, 2011. *Walls*, 21 F. Supp. 3d at 897 (citing Tenn. Code Ann. 50–1–304(g)). Though the parties in their briefing do not expressly mention the *McDonell Douglas* framework by name, it is clear by the structure of their briefing and references to key concepts, such as "pretext" or "termination for legitimate, nondiscriminatory reasons," that both parties are following the *McDonell-Douglas* framework.

is not the case under the federal *McDonnell Douglas* standard. This raises the question of whether the state (TPPA) or federal version of *McDonnell Douglas* should apply to a claim under the TPPA on a defendant's motion for summary judgment. Forgoing the potentially thorny analysis required to resolve that issue, the Court herein assumes *arguendo* (to Plaintiff's benefit) that the federal standard applies.

Within the context of a motion for summary judgment, the Court must account for the fact that Rule 56 requires the movant (here, Defendant) to make the first move (by showing preliminarily a dearth of evidence to support the plaintiff's claims) rather than sit back and see whether the plaintiff has adequate evidence for his claims—and there is no reason why this truism would be inapplicable merely because the *McDonnell Douglas* burden-shifting framework is involved. Consequently, on the instant Motion, the Court applies the following burden-shifting approach under *McDonell-Douglas*:

> To prevail at the first step of *McDonnell-Douglas*, the defendant, as the summary-judgment movant, must meet its initial burden of showing an absence of evidence from which a reasonable jury could find the plaintiff established a prima facie case. *E.g., Banks v. State of Ohio*, No. 94–3866, 1995 WL 118993, * 2 (6th Cir. Mar. 20, 1995). If the defendant does so, then the burden shifts to the plaintiff to show that at trial it could "make out a prima facie case of discrimination by a preponderance of the evidence." *Redlin*, 921 F.3d at 606. If the plaintiff fails to succeed here, then the plaintiff suffers summary judgment in favor of the defendant on the claim. But if the plaintiff succeeds here, defendant does not prevail at the first step and is relegated to try instead to prevail at the second and third steps of *McDonnell-Douglas.*
>
> At the second step, the defendant[] has the burden (of production only) to show a legitimate and non-discriminatory reason for its action(s). *Brown*, 814 F. App'x at 80 (noting, on the defendant's motion for summary judgment that it is a "burden of production [that potentially] shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff"). If the defendant successfully shows evidence of a non-discriminatory reason for its alleged discriminatory act, the court proceeds to the third step, where "the plaintiff must rebut the proffered reason by producing evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext" for unlawful

discrimination. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (quotations omitted).

*Veith v. Tyson Fresh Meat, Inc.*, No. 3:19-CV-01065, 2022 WL 1231229, at *9-10 (M.D. Tenn. Apr. 26, 2022) (Richardson, J).[14]

*McDonnell Douglas* applies only to discrimination or retaliation claims premised on so-called indirect (i.e., circumstantial) evidence. *Redlin,* 921 F.3d at 606–07. It does not apply to the extent that they are premised on so-called direct evidence.[15]

As noted, *McDonnell Douglas*'s first step is the plaintiff establishing (if the plaintiff can) a *prima facie* case. Here, that means a *prima facie* case of retaliation in violation of TPPA.

---

[14] It is important to recall the context in which the *McDonell Douglas* framework was announced. *McDonell Douglas* was an appeal after a bench trial, not an appeal after a decision on a motion for summary judgment. (Notably, the same can be said for the below-referenced referenced *Burns* case from the Tennessee Supreme Court). It is the view of the undersigned to keep this in mind, because it explains why a court addressing a motion for summary judgment cannot just plug in language from *McDonnell Douglas* and apply it just as written, without accounting for the specific burden-shifting analysis required on every summary-judgment motion; it is vital that when the *McDonnell Douglas* framework is used on a summary-judgment motion— something Justice Thomas seriously doubts should ever happen, *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 322 (2025) (Thomas, J., concurring)—the framework be modified to account for the legal standard applicable to summary judgment motions. *Id.* at 323. ("If courts are to apply *McDonnell Douglas* at summary judgment, they must modify the framework to match the applicable legal standard.") Herein, and per its usual practice, the undersigned has done its level best to make such modifications—sometimes expressly, sometimes not expressly, but always with intentionality.

Such modifications are not particularly easy to make (or explain), due to the "complex issues related to the interplay of the summary judgment standard and *McDonnell Douglas*." *Qualls v. Regents of the Univ. of California*, No. 113CV00649LJOSMS, 2015 WL 6951757, at *3 (E.D. Cal. Nov. 10, 2015). The complexity arises from the fact that the Court must layer one burden-shifting framework (the summary-judgment standard) on top of another burden-shifting framework (*McDonnell Douglas*). But these modifications must be made. But they do need to be made, and they are reflected in the language quoted here from *Veith v. Tyson Fresh Meat, Inc*., No. 3:19-CV-01065, 2022 WL 1231229, at *9-10 (M.D. Tenn. Apr. 26, 2022) (Richardson, J). (Importantly, the "modifications" that the Court is talking about here— modifications of the bench-trial context for use the summary-judgment context— are different from the above-referenced modification of the *McDonnell Douglas* standard for use in the context of TPPA claims).

[15] "Direct evidence is such that, if true, requires the conclusion that unlawful retaliation [or discrimination] was a motivating factor without any inferences or presumptions." *Banks v. Bosch Rexroth Corp*., 15 F. Supp. 3d 681, 693 (E.D. Ky. 2014), *aff'd*, 610 F. App'x 519 (6th Cir. 2015) (citing *Norbuta v. Loctite Corp*., 181 F.3d 102 (6th Cir. 1999)). Indirect evidence is evidence that requires the court to make inferences to conclude that unlawful retaliation or discrimination was a motivator for an adverse employment action.

*McDonnell Douglas* itself has nothing to say about what is required to establishing a *prima facie* case; instead, naturally, state law tells the Court what is required to establish a *prima facie* case of retaliation in violation of TPPA.

The availability of retaliatory discharge claims under the TPPA extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated. *Williams v. Greater Chattanooga Public Tele. Corp.,* 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011) (citing *Mason v. Seaton,* 942 S.W.2d 470, 472 (Tenn. 1997)). To make out a *prima facie* case of a violation of the TPPA based on indirect evidence, a plaintiff must establish the following four elements: (1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in, or remain silent about, illegal activity; (3) the defendant employer discharged or terminated the plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity. *Walls v. Tennessee CVS Pharmacy, LLC*, 21 F. Supp. 3d 889, 896 (M.D. Tenn. 2014) (Trauger, J.) (citing *Webb*, 346 S.W.3d 437); *Sykes v. Chattanooga Housing Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011); *see also Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528 (Tenn. 2002); *Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997).[16]

Courts have recognized "that the plaintiff has indeed a formidable burden" in establishing the second and fourth elements of a prima facie showing of a claim of retaliatory discharge under TPPA. *Darnall v. A+ Homecare, Inc.*, No. 01–A–01–9807–CV–00347, 1999 WL 346225, at *5 (Tenn. Ct. App. June 2, 1999) (internal citations omitted). Moreover, proximity in time between

---

[16] Some of these cases refer to these as elements of a "claim" under the TPPA. This is imprecise; they are instead, as noted, elements merely of a *prima facie* case of a TPPA violation—which, even if it is established, is insufficient to establish the claim because the defendant still could prevail at later stages of the (modified or unmodified) *McDonnell Douglas* analysis.

the protected activity and the termination is not sufficient to establish a causal relationship. *Mason*, 942 S.W.2d at 473.[17]

Defendant contends that Plaintiff cannot show an illegal activity on the part of Defendant (the second element), or causation (the fourth element). Defendant argues that Plaintiff lacks evidence to show the second element because the (alleged) illegal activity was not committed not by Defendant,[18] but instead by another entity, Gabriella,[19] that is not Plaintiff's employer. (Doc.

---

[17] The Court notes in passing that the same is not necessarily true with respect to a *prima facie* case of retaliation under federal employment-discrimination laws such as Title VII.

[18] Though it is not addressed in Plaintiff's Response, Defendant raises via its Memorandum that the (alleged) illegal activity by Defendant comprises the following (and only the following): using Cabinets To Go trucks to transport Defendant's wine and storing Defendant's inventory in a Cabinets To Go warehouse. (Doc. No. 50 at 24). Defendant argues that Plaintiff cannot have a reasonable basis to believe that this conduct violated federal or state law, because Plaintiff knew prior to his employment with Defendant that Defendant stored its inventory in separate, designated portions within Cabinets To Go warehouses across the country, including in California and Tennessee. (Doc. No. 50 at 25) (citing Doc. No. 61 at ¶¶ 16, 103-04). However, the responses to the Statements of Fact on which Defendant relies do not support what Defendant purports; rather, they indicate only that Plaintiff and Sullivan met in Lawrenceburg, Tennessee, to visit a location where Defendant warehoused some of its inventory (Doc. No. 61 at ¶16); that Plaintiff vaguely alleged his concerns about Defendant's compliance with state and federal regulations in its transportation and storage of wine, and Plaintiff testified during his deposition that the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") periodically inspects companies to ensure compliance, (Doc. No. 61 at ¶ 103); and that Plaintiff disputes whether he knew that ATF inspected Defendant's facility and found no violations or compliance issues (Doc. No. 61 at ¶ 104).
Even if the Court viewed Facts 16, 103, and 104 as being undisputed, they do not actually bear on whether Plaintiff can satisfy the second element of a TPPA claim via Gabriella*'s* (alleged) illegal activity discussed herein, namely: continuing to sell Defendant's wine in California, in violation of an exclusive contract with another distributing company; holding Defendant's wine without permission in violation of federal and/or state laws; and dumping inventory.

[19] For context, Gabriella is a wine importer and distributor that distributed Defendant's wines in California and Florida, (Doc. No. 37 at ¶ 28); however, Plaintiff testified that at the direction of his boss, Tom Sullivan, Plaintiff terminated Gabriella as Defendant's distributor in California and Florida in early 2019. (Doc. No. 52-1 at 30-31 (pages 116, 118-119)). According to Plaintiff, Gabriella "refus[ed] to accept the reality that they were no longer our distributor in California," (*Id*. at 31 (page 121)). Plaintiff points to Gabriella's refusal to relinquish inventory in California, (*id*. at 30 (page 119)), and "continu[ation] to sell [Defendant's] wine way off of price strategy" (*id*. at 32 (page 124)), as the illegal activity establishing the second element of his TPPA claim of retaliatory discharge.
Plaintiff admits via his response to Fact 95 that the (alleged) illegal activity includes: (1) Gabriella continuing to sell Defendant's wine in California, in violation of an exclusive contract with Phoenix Distributing Company; (2) Gabriella holding Defendant's wine without permission in violation of federal and/or state laws; and (3) Gabriella (allegedly) dumping inventory (i.e., selling Defendant's wine way off its price strategy). (Doc. No. 61 at ¶ 95).

No. 50 at 23). Defendant makes no showing that Plaintiff lacks evidence to show that illegal activity occurred. Instead, Defendant asserts that a claim under the TPPA requires the plaintiff to plead that retaliation resulted from plaintiff reporting illegal conduct by his or her *employer* in particular.[20] Neither the plain language of the TPPA nor the elements of a claim under the TPPA support Defendant's assertion that the illegal activity must be performed by the employer specifically. *See* Tenn. Code Ann. § 50-1-304(b); *see also Thompson v. Memphis Light, Gas & Water*, 416 S.W.3d 402, 411 (Tenn. Ct. App. 2011) ("We have held that under T.C.A. § 50–1–304(c), the "'illegal activities' need not be by the employer") (citing *Guy*, 2001 WL 204485, at *10, *aff'd*, 79 S.W.3d 528 (Tenn. 2002)); *Downing v. Astrazeneca Pharms. LP*, No. 3:22-CV-00447, 2023 WL 4672411, at *4 (M.D. Tenn. July 20, 2023) (Campbell, Chief J.). Thus, contrary to Defendant's assertion, there is no requirement that the transgressor must be the employer.

Alternatively, Defendant argues that Plaintiff lacks evidence to show the second element: because "Plaintiff neglects to mention to whom he 'expressed concern,' when this expressed concern occurred, and the content of any such conversations." (Doc. No. 50 at 25). This is unavailing for two reasons. Contrary to Defendant's argument, Plaintiff does mention to whom he made his disclosure, which included Sullivan, "other employees [Plaintiff] worked with," Gabriella, brokers, and Phenix Distributors. (Doc. No. 63 at 17) (Doc. No. 52-1 ¶¶59-62, Exs.12-

---

[20] Defendant cites *Sanders v. Henry Cnty.*, No. W200801832COAR3CV, 2009 WL 1065916, at *8 (Tenn. Ct. App. Apr. 21, 2009) to support its argument that the employee must actually believe his employer is violating a law or regulation and "cannot meet this burden simply by claiming that he believed his employer's actions were 'wrong' or against 'public policy.'" (Doc. No. 50 at 23). *Sanders* only supports the second portion of this argument; this is, that "an employee cannot meet this burden simply by claiming that he believed his employer's actions were 'wrong' or against 'public policy,'" (*id*.), which does not necessarily stand for the proposition that the employer's conduct violated a law or regulation.

Defendant also cites *Caruso v. St. Jude Children's Research Hosp., Inc.*, 215 F. Supp. 2d 930, 937 (W.D. Tenn. 2002), to support its argument that complaining about the actions of another entity is insufficient to satisfy the second prong of a TPPA claim. (Doc. No. 50 at 23). *Caruso* does not support—much less address—Defendant's argument.

14) (citing *Partain v. Wal-Mart Stores, Inc.*, 2009 WL 2996376, *7 (E.D. Tenn. Sept. 15, 2009).

This is sufficient. In *Collins v. AmSouth Bank*, 241 S.W.3d 879 (Tenn. Ct. App. 2007),[21] the court

held that although the plaintiff is not required to report the illegal activity directly to law or

regulatory enforcement officials, "they must make a report to some entity other than the person or

persons who are engaging in the illegal activities." *Haynes v. Formac Stables, Inc.*, No. W2013-

00535-COA-R3CV, 2013 WL 6283717, at *4 (Tenn. Ct. App. Dec. 4, 2013), *aff'd*, 463 S.W.3d 34

(Tenn. 2015) (quoting *Collins*, 241 S.W.3d at 885). Accepting Plaintiff's assertion that the illegal

activity was conducted by Gabriella (as well as Defendant), Plaintiff has at a minimum created a

---

[21] The Court notes that in citing cases herein to identify or explain its view as to what Tennessee law is on a particular topic or issue, the Court is mindful of the so-called *Erie* doctrine, whereby the Court should not necessarily accept that a court's prior statement of Tennessee law accurately reflects current Tennessee law. (Notably, at times the Court cites cases that purport to state Tennessee law, but does so for some purpose other than to identify or explain *the Court's view* as to what current Tennessee law is—for example, in order to note a particular view of some aspect of Tennessee law that is held by some courts but not necessarily by other courts and not necessarily by the undersigned judge of this Court).

The *Erie* doctrine was announced in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). "Under the *Erie* doctrine, a federal court sitting in diversity applies 'the substantive law of the forum state and federal procedural law.'" *Bonasera v. New River Elec. Corp.*, 518 F. Supp. 3d 1136, 1151 (S.D. Ohio 2021) (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).

The Sixth Circuit has explained:

> In diversity cases such as this, [the *Erie* doctrine requires that] we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise."

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citations and footnote omitted) (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995)). When applying state law, we "must follow the controlling decision of the highest state court." *See also Am. Tooling Ctr. Inc. v. Travelers Cas. & Sur. Co. of Am.*, 895 F.3d 455, 460 n.1 (6th Cir. 2018) (noting that if no state supreme court case law is controlling, the court should "follow a decision of the state appellate court, published or unpublished," unless we are "'convinced . . . that the highest court of the state would decide otherwise.'") (quoting *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001)).

Herein, when the Court cites a decision of the Tennessee Court of Appeals, it does so with confidence that the Tennessee Supreme Court today would not decide differently with respect to the cited proposition(s).

genuine dispute as to whether he reported his concerns regarding illegal activity to individuals who were not involved in the (alleged) illegal activity.

Therefore, the Court finds that Defendant has not met its initial burden it bears to show that Plaintiff lacks evidence to establish the second element of a claim for retaliatory discharge under TPPA.

Regarding causation (the fourth element), more is required for a TPPA claim than for a common-law claim of retaliation, in that a TPPA claim requires "an exclusive causal relationship between the refusal to participate in, or remain silent about, illegal activities and [the employee's] termination." *Sourinho v. Rich Prods. Corp.*, 2021 WL 4735844, at *3 (6th Cir. Oct. 12, 2021) (quoting *Amos v. McNairy Cnty.*, 622 F. App'x 529, 536 (6th Cir. 2015)) (emphasis added). Thus, a plaintiff "can prevail . . . '*only* if he . . . can prove that his . . . refusal to participate in or remain silent about illegal activities was the only reason for the termination.'" *Jones v. City of Union City*, No. CC-12-CV-84, 2015 WL 9257815, at *6 (Tenn. Ct. App. Dec. 17, 2015) (quoting *Williams*, 465 S.W.3d at 110-11) (emphasis added). *See also* Walls, 21 F. Supp. 3d 889, 897 (M.D. Tenn. 2014) ("[T]he TPPA requires a plaintiff to show that 'his whistleblowing behavior was the sole reason for his termination,' whereas a common law retaliatory discharge claim requires only that the whistleblowing behavior was a 'substantial factor' in the termination." (citation omitted)).

Nevertheless, the Court will assume *arguendo* that Plaintiff has made such a showing. But like any plaintiff that survives a causation challenge at the *prima facie* case (first) stage of a *McDonnell Douglas* analysis, Plaintiff still potentially can lose; Defendant still has a shot at prevailing (based on a lack of causation) at the latter two stages. *See Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-CV-00491, 2022 WL 1283087, at *68 (M.D. Tenn. Apr. 28, 2022) (Richardson, J.).

And so, the burden shifts to Defendant, as the employer, to "introduce admissible evidence showing that unlawful retaliation was not the sole cause of the employment action." *Williams*, 465 S.W.3d at 115 (citing *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999)). "That is, the employer must proffer evidence that, even if retaliation was a motivation for the discharge, there was at least one non-retaliatory reason as well." *Williams*, 465 S.W.3d at 115. Defendant argues that it gave three legitimate, non-retaliatory reasons for Plaintiff's termination at the time of his termination: Plaintiff's excessive spending, failure to establish distributors, and failure to perform his job duties in adequate manner. (Doc. No. 50 at 25) (citing Doc. No. 51 at ¶¶ 28, 111-31). As discussed in further detail below, the record (via deposition testimony) indicates that Defendant has *consistently* claimed (at least) one legitimate, non-retaliatory reason for Plaintiff's termination: excessive travel expenses. As such, Defendant has satisfied its initial burden that Plaintiff's termination was not *solely* based on his refusal to participate in or remain silent about the illegal activity.

However, this is not the end of the analysis. Once the employer has proffered a non-retaliatory reason for the employee's discharge, "the employee must have a full and fair opportunity to demonstrate that the employer's proffered reasons are pretextual and that unlawful [retaliation] was the true reason for the challenged employment action."[22] *Wilson*, 104 S.W.3d at 50 (citing *Burdine*, 450 U.S. at 256); *see also Versa v. Policy Studies, Inc.*, 45 S.W.3d 575, 580 (Tenn. Ct. App. 2000) ("The question is not whether the employer's decision was sound, but

---

[22] This is step three of the *McDonnell Douglas* framework. At this stage in the analysis, "the *McDonnell Douglas* burden-shifting framework f[alls] away and the trier of fact [is] left to determine the ultimate question of [retaliation]." *Gibson v. City of Louisville*, 336 F.3d 511, 513 (6th Cir. 2003). "[I]n other words, the question becomes whether the plaintiff has established that it is more likely than not that the employer's proffered reason 'is mere pretext and thus a coverup' for the employer's true retaliatory motive." *Barry v. U.S. Capitol Guide Bd.*, 636 F.Supp.2d 95, 102–03 (U.S.D.C. 2009) (quoting *Vickers v. Powell*, 493 F.3d 186, 195 (D.C. Cir. 2007) (internal quotations omitted)).

whether the employer's asserted reason for the adverse employment decision is pretextual."); *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988) ("The more questionable the employer's reason, the easier it will be for the jury to expose it as pretext.").

"An employee may demonstrate that an employer's proffered, non-discriminatory reasons for an adverse employment action are pretextual by revealing the weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation." *Lyons v. PSC Metals, Inc.*, No. 3:07-0997, 2008 WL 4525417, at *5 (M.D. Tenn. Oct. 1, 2008) (quoting *Wilson v. Rubin*, 104 S.W.3d 39, 50-51 (Tenn. Ct. App. 2002)). Pretext is typically (though not necessarily) shown in one of three ways: (1) the proffered reason has no basis in fact; (2) the proffered reason did not actually motivate the termination; or (3) the proffered reason is insufficient to explain the termination.[23] *Walls*, 21 F. Supp. 3d 899. The court must look at all the evidence, including evidence submitted by the plaintiff to establish his *prima-facie* case. *Burdine*, 450 U.S. at 255 n.10. After doing so, the court must decide whether the evidence as a whole gives rise to an inference that the employer's proffered non-retaliatory reason is pretextual. *See Phillips v. Anderson Cnty.*, No. E2009–01883–COA–R3–CV, 2010 WL 4514886, at *6 (Tenn. Ct. App. Nov. 10, 2010) (reasoning that causation must be determined by giving "careful consideration of the entirety of the evidence of the circumstances surrounding the employer's action in light of the employee's [protected conduct]"); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976).

Plaintiff does not explicitly state which (if any) of the three typical approaches of showing pretext he is taking here, but it is apparent that Plaintiff is pursuing the second and third approach. He states that "Defendant's shifting reason for its termination decision demonstrate[s] pretext."

---

[23] It is readily apparent that the three reasons overlap with one another to an extent. For example, if the proffered reason is insufficient to explain the termination or has no basis in fact, that supports the notion that the proffered reason did not actually motivate the termination.

(Doc. No. 63 at 19). In so doing, Plaintiff is attacking the credibility of the proffered reason, which is an established way of showing, per the second approach, that the proffered reason did not actually motivate the termination. *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 342–43 (6th Cir. 1997) (holding that to show that a defendant's proffered reason did not actually motivate discharge, a plaintiff may show that the employer's explanation is not credible). And he asserts that similarly situated employees have been treated differently, to the extent that Plaintiff was fired for failing to obtain distributors. (Doc. No. 63 at 20). In so doing, he is asserting that one of the proffered reasons—failure to obtain distributors—is insufficient to explain the termination. *See Versa*, 45 S.W.3d at 581 ("[t]o show that a defendant's proffered reason is insufficient to motivate discharge, a plaintiff must produce evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.") (internal citation and quotation marks omitted).

Taking the second approach (that Defendant's proffered reason did not actually motivate his termination, as revealed by Defendant purportedly giving shifting reasons for Plaintiff's termination), Plaintiff contends:

> In his deposition, Sullivan stated that he fired [Plaintiff] when he gave "the stupidest excuse" for a trip to Aspen that had occurred in September. (Sullivan Dep. at 182). Sullivan did not ask [Plaintiff] about the trip or any other travel expenses when they happened, nor did Sullivan bother to speak with anyone else before he fired [Plaintiff]. (McPherson Decl. ¶ 45; Sullivan Dep. at 183-184). Now Defendant argues that the reason for termination also had to do with the number and quality of distributors [Plaintiff] had secured and the length of time it took to secure them. (SOF ¶¶119-124).

(*Id*. at 19)[24] (citing *Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("Shifting justifications over time calls the credibility of those justifications into question.")).[25]

The Court is unpersuaded—at least as to one proffered reason—that Defendant shifted its justification for termination as Plaintiff argues. The record indicates that Defendant has *consistently* maintained (at least) one legitimate, non-retaliatory reason for Plaintiff's termination: excessive travel expenses. In fact, Plaintiff testified during his deposition that travel expenses were mentioned during a conversation he and Sullivan had at the time of Plaintiff's termination:

---

[24] This word "also" in this quote is telling because it reveals that Plaintiff is not actually claiming that Defendant at some point abandoned the first reason. Plaintiff instead is claiming only that Defendant has *added* reasons. Does *adding* reasons amount to "shifting" the justification? The Court thinks perhaps not; adding reasons constitutes *supplementing* the justification, which is not synonymous with *shifting* the justification. Thus, the Court concludes that arguably Plaintiff is not even claiming something that amounts in substance to a shifting justification.

[25] This case is inapposite here. In *Cicero*, the Sixth Circuit held that "[i]t was not until after [defendant] fired [plaintiff] that [defendant] raised serious complaints about [plaintiff's] performance, and even then, [defendant] gave shifting justifications for his discharge. *Cicero*, 280 F.3d 579, 592. The court found it telling that the first time the defendant mentioned that it fired plaintiff because of poor performance was in its answers to plaintiff's interrogatories. *Id*. Here, the record would suggest that Defendant maintained at least one legitimate, non-retaliatory reason ever since the time of Plaintiff's termination: excessive travel expenses. True, it is disputed whether Defendant considered other non-retaliatory reasons in its decision to terminate Plaintiff (such as, his acquisition of distributors (or failure thereof) or his work performance). (*See* Doc. No. 61 at ¶¶ 119-129). But as further discussed below, this does not change the Plaintiff's burden to show that a retaliatory motive was the *sole* reason for his termination.

Q. Okay. Tell me about the first call. What did you-all discuss?

A. I was trying to get an explanation as to why he wanted to get rid of me.

Q. And what did he tell you?

A. He was ambiguous. Just said it wasn't working for him.

Q. Did he explain why it wasn't working for him?

A. No.

Q. Did he say anything about your expense account or your expenditures?

A. He asked me a couple of questions about a hotel room charge in Paris when we went to premier week, and that was it.

(Doc. No. 52-1 at 37 (Page 143)).[26, 27] Plaintiff's testimony reveals that travel expenses were

mentioned (albeit only briefly) during conversations at the time of Plaintiff's termination. (*See*

[26] Other testimony in the record supports the notion that Sullivan claimed from the beginning that a concern about Plaintiff's travel expenses was grounds for Plaintiff's termination. Plaintiff testified during his deposition regarding a conversation he had with Andrew Trottier, another employee of Defendant, after the above-referenced conversation with Sullivan:

> Q. Did Andrew tell you anything else about the reasons for your termination as far as anything he knew or that Tom had told him?
>
> A. He said that Tom mentioned I'd been dishonest or something like that.
>
> Q. Did he elaborate on that at all?
>
> A. He did not.

(Doc. No. 52-1 at 37 (Page 144)). It axiomatic that, hearsay cannot be used to support a motion for summary judgment (i.e., to help the movant satisfy its initial burden). But that rule does not preclude the consideration of any of this testimony. As an initial matter, Plaintiff's own testimony of course is not hearsay. But it is true that within his testimony is hearsay—namely, Trottier's out-of-court statement that Sullivan had told him (Trotter) that Sullivan had said that Plaintiff "[ha]d been dishonest or something like that." But as the Eleventh Circuit has noted in a helpful summary of the law in this area, is hearsay admissible as long as it can be "reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir.1999)). And hearsay is generally considered reducible (i.e., capable of being reduced) to admissible form if "the hearsay declarant [could] testify directly to the matter at trial." *Id.*

Of course, no one can *guarantee* what a hearsay would testify at trial, but it appears that hearsay nevertheless is considered reducible to admissible form absent reason to believe that the declarant would *not* testify at trial consistent with that statement, as for example when the declarant gave deposition testimony during discovery that contradicts the statement. *Id.* The Court does not perceive any reason to believe that Trottier at trial would testify in contradiction to his statement to Plaintiff that Sullivan mentioned that Plaintiff "[ha]d been dishonest or something like that." (Trottier's deposition testimony, discussed below, is that Sullivan indicated a concern about excessive spending, which (as noted below) naturally could have been conveyed as being at least in part a matter of "dishonesty"). Thus, that statement is not excludable, by virtue of the rule against hearsay, on motion for summary judgment. Finally, Sullivan's underlying statement to Trottier is not hearsay because it is a statement of the declarant's (Sullivan's) then-existing state of mind (as contrasted with, most notably, a statement of raw fact): that is, his (supposedly) *believing* something, i.e., that Plaintiff had been dishonest ("or something like that").

What this all means is that the Court can consider the (alleged) fact that Sullivan told Trottier that Plaintiff had been dishonest (or something like that). This statement of Sullivan is relevant because it is consistent with (though concededly not conclusive regarding) the notion that Sullivan from early on was at least purporting to be upset with Plaintiff about travel expenses—which, when claimed by an employee in excess of what is reasonably necessary in connection with the employee's work, naturally can be purported by the employer to be a matter of "dishonesty."

Then there is Trottier's own deposition testimony about what Sullivan told Trottier "really close to when [Plaintiff] was terminated"—apparently during the same conversation Trottier told Plaintiff about—regarding Sullivan's state of mind (belief) regarding Plaintiff's expenditures: that Plaintiff was "spending

Doc. No. 61 at ¶ 112).[28] Consequently, Plaintiff has not shown pretext on the basis of shifting

justifications (the second approach).

---

too much money versus what sales were coming. (*See* Doc. No. 52-17 (page 63-64 of Trottiers's deposition)).·This testimony—which is "reducible" to admissible form at trial—is plainly consistent with the notion that Trottier claimed to have a concern regarding Plaintiff's *travel* expenses in particular.(irrespective of whether Sullivan claimed that his concern was one of "dishonesty").

[27] The fact that Plaintiff gave the above testimony regarding his conversation with Sullivan is undisputed. (Doc. No. 61 at ¶ 79).

[28] Plaintiff largely disputed the Statements of Fact relied on by Defendant to show its legitimate, non-retaliatory reasons for Plaintiff's termination. But Plaintiff (based on the wording of his response) has admitted Fact 112, which establishes that Plaintiff did spend an excessive amount of money on Defendant's credit card for non-business expenses. Indeed, Plaintiff in his response to Fact 112 does not dispute his spending, but rather takes a different tack to dispute that Defendant terminated Plaintiff for his excessive travel expenses: asserting that Defendant neither inquired about Plaintiff's spending nor disciplined Plaintiff for his spending:

> 112. During Plaintiff's employment, he spent an excessive amount of money on Vignobles' credit card for non-business-related expenses. These expenses included, but are not limited to, dinners with his wife, flights purchased for his wife, frequent flights to Atlanta, stays at fancy hotels, spa trips, grocery expenses, and rental car purchases and rideshare purchase on the same trip. (*Id*. at 184-85; Sullivan Decl. at ¶¶ 14, 17).
>
>> **RESPONSE**: Sullivan did not investigate any of these allegations or question [Plaintiff] on them, and if Sullivan had any questions about the expenses, he had ample opportunity to question [Plaintiff] at any point during the employment tenure. [Plaintiff]'s expenses were legitimate business expenses performed in the course of marketing and selling the Vignobles wines, and [Plaintiff] never received any verbal or written warning or disciplinary action for his expenses. (Sullivan Dep. at 183-185; McPherson Decl. ¶¶ 31-51).

(Doc. No. 61 at 112). This response does not conform to the requirements of the local rules of this Court for disputing a (purported) fact included in a statement of facts.. Those rules currently provide in pertinent part that: "[e]ach numbered response must start with 'Undisputed,' 'Undisputed for Summary Judgment Purposes Only,' or 'Disputed'; and "[l]egal arguments, including as to materiality of any fact, must be made in the responding memorandum, not in the response to the statement of undisputed material facts."" LR 56.01(e)(2), (e)(5) (eff. May 15, 2025). Likewise, the local rules of this Court in effect at the time Plaintiff responded to the Motion provided in pertinent part:: "Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:**(1)** Agreeing that the fact is undisputed; **(2)** Agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or **(3)** Demonstrating that the fact is disputed. . . . ." LR 56.01(c) (eff. Jan. 24, 2020) .

Not only does Plaintiff's response not serve to dispute the fact(s) asserted in Fact 112, but Plaintiff's citation to Sullivan's deposition testimony (if anything) actually supports the accuracy of Fact 112. (*See* Doc. No. 52-12 at 47-48 (pages 183-185)) (wherein Sullivan testified that when he saw Plaintiff's travel expenses, he asked Plaintiff about it, prior to November 14).

In taking the third approach, Plaintiff argues that a similarly situated employee, Andrew Trottier, has been treated differently. (Doc. No. 63 at 20). Relying on Mr. Trottier's deposition testimony, Plaintiff argues that since the time that Mr. Trottier "took the helm," the actual footprint of distributors for Defendant has shrunk, and yet Mr. Trottier has not been fired and is paid with commissions without a contract in place. (Doc. No. 63 at 20) (citing Doc. No. 52-14 at 15, 19 (pages 55 and 72 of Trottier deposition)). When an employee argues that the proffered reason was insufficient to motivate his discharge, he must show by a preponderance of the evidence that "other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of [the plaintiff]." *Blizzard v. Marion Tech. College,* 698 F.3d 275, 286–87 (6th Cir. 2012). The comparison must be with employees who committed "acts of comparable seriousness," and the conduct must be of similar "severity and frequency." *Id*. at 287. "Substantially identical conduct" means "the same conduct without such differentiating or mitigating circumstances that would distinguish [the employees'] conduct or the employer's treatment of them for it." *Huelett v. Louisville Paving Co., Inc*., No. 25-5241, 2025 WL 3688924, at *5 (6th Cir. Dec. 19, 2025) (quoting *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 352 (6th Cir. 1998)).

Plaintiff has not made any such showing. First, the deposition testimony of Mr. Trottier on which Plaintiff relies does not support that Mr. Trottier failed to establish distributors.[29] (Doc. No.

---

[29] The deposition-testimony cites on which Plaintiff relies describe a present-day map of distributors (specifically noting that Defendant no longer has distribution in California) and verify that Mr. Trottier receives a commission without having a written contract in place.

In fairness to Plaintiff, he uses Mr. Trottier's deposition to support multiple points, namely that (1) the "actual footprint of distributors for Defendant [ ] shrunk" after Mr. Trottier "took the helm"; (2) Mr. Trottier has not been fired; and (3) Mr. Trottier receives a commission without a written contract. True, Plaintiff's deposition-testimony cites *do* support the last two points above; however, as stated above, neither cite supports the notion that Mr. Trottier failed to establish distributors. Thus, Plaintiff has not shown via the record that Mr. Trottier engaged in conduct substantially identical to the conduct (failing to establish

52-14 at 15, 19 (pages 55, 72)). Second, even assuming that Mr. Trottier failed to establish distributors, that failure alone is not enough to show that Plaintiff and Mr. Trottier engaged in substantially identical conduct, as Defendant purports three bases that motivated its discharge of Plaintiff, including Plaintiff's excessive spending, failure to establish distributors, and failure to perform his job duties in adequate manner.[30] (Doc. No. 50 at 25) (citing Doc. No. 51 at ¶¶ 28, 111-31). Accordingly, Plaintiff has not shown pretext on the basis of insufficient motivation to discharge (via looking at similarly situated employee(s)) (the third approach).

Accordingly, Plaintiff has not demonstrated that at least one proffered, non-discriminatory reason for Plaintiff's termination is pretextual—i.e., Plaintiff has not survived on his resulting burden under the *McDonnell Douglas* framework as applied to his TPPA claim.

In sum, Plaintiff has failed to show that he could establish all four elements of a claim for retaliatory discharge under TPPA, and therefore, the Court will **grant** the Motion as to Plaintiff's TPPA claim for retaliatory discharge (Count One).

---

distributors) that constitutes one of three reasons proffered by Defendant as a basis for Plaintiff's termination.

[30] It does not logically follow that Plaintiff need show only that his comparator engaged in *one* of three bases for Plaintiff's termination. Essentially what Plaintiff argues is that even if he metaphorically took three cookies from the jar while his comparator took only one, they share substantially identical behavior and should have (and would have, absent retaliatory animus against him) received the same punishment.

Even if one or two of three bases for terminating Plaintiff were deemed pretextual, that would not be very probative unless the pretextual basis (or one of the two pretextual bases) was (i) the same basis as the one consistently given by Defendant since the time of termination and (ii) applicable also to a comparable employee who remained employed remained employed. In this case, that basis was excessive travel expenses, which as shown above was not the basis used by Plaintiff to demonstrate how he and Andrew Trottier are similarly situated.

## II.   Count Two: Breach of Contract

In the Response, Plaintiff argues that the Employment Agreement is binding and enforceable. [31] (Doc. No. 63 at 10). And yet, by filing in this Court, Plaintiff has flouted the Employment Agreement's venue provision, whereby the parties agree to the exclusive jurisdiction "of the state and federal courts of Miami-Dad County, Florida." (*See* Doc. No. 52-2 at ¶ 12(b)). Likewise, by citing only Tennessee law in his briefing, Plaintiff has flouted the Employment Agreement's governing-law provision, which provides that the Employment Agreement shall be governed by Florida state law. (*See id. at* ¶12(g)). Plaintiff is seeking to have it both ways: (i) asking the Court to treat the Employment Agreement as enforceable—in which case Plaintiff should have filed his lawsuit elsewhere (in Maimi-Dade County, Florida) pursuant to the terms of the Employment Agreement—while (ii) implicitly treating the Employment Agreement as not binding by filing his lawsuit in this Court. However, the reality (which may strike some as unsatisfying) is that it does not appear that a plaintiff, by filing suit in a court other than the one(s) specified in a forum-selection clause in an alleged contract, does not waive or forfeit the right to claim that the contract is enforceable or subject the suit to dismissal for improper venue. [32] *See*

---

[31] Moreover, Plaintiff alleges via the Second Amended Complaint that he and Defendant had a valid and enforceable contract to pay salary, bonuses, and vacation for work performed by Plaintiff on Defendant's behalf. (Doc. No. 37 at ¶ 74). Plaintiff also alleges that the Employment Agreement, presented by Mr. Sullivan, set out the basic terms of his employment, with additional terms—not in the Employment Agreement—being negotiating by the parties. (*Id.* at ¶¶ 14, 15).

[32] This does not change the fact that if Plaintiff insists that the Employment Agreement is a binding and enforceable contract, then it seems that he should have (i) filed suit not in this Court, but rather in a court contemplated by the Employment Agreement's forum-selection clause; and (ii) asserted that Florida law rather than Tennessee law is applicable to this claim. Nor does it change the fact that if the Court were to treat the Employment Agreement as binding, Plaintiff's entire suit would be subject to transfer under the doctrine of *forum non conveniens.* As explained recently by another district court in this circuit:

> As an initial matter, the question of "whether venue is 'wrong' or 'improper'" is "generally governed by 28 U.S.C. § 1391." *Atl. Marine Const. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 55 (2013). The issue here [raised by the existence of a

*Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas*, 571 U.S. 49, 60 (2013) (holding that the violation of a forum selection in a contract does not render venue improper for purposes of Fed. R. Civ. P. 12(b)(3)).

Moreover, neither Plaintiff nor Defendant addresses choice-of-law in their briefing; rather, both assume that Tennessee contract law applies to Plaintiff's breach-of-contract claim. In view of this presumption by the parties, the Court will do the same without further analysis.

As an initial matter, it is important to note that Plaintiff and Defendant's respective theories of whether there is or is not a binding agreement between them posit different contracts (and different types of contracts). Plaintiff argues that the parties had a "handshake agreement," while Defendant argues that the Employment Agreement is not a binding contract.

The Court will not treat Defendant, to meet its initial burden at the summary judgment stage, as needing to show that there is not a "handshake agreement," because the "handshake

---

forum-selection clause) is not one of an "improper venue" under Section 1391, [*see* Doc. 20 at 1]; instead, it is an issue of the application of the doctrine of *forum non conveniens* to this case based on the forum selection clause, *see id.* at 55-59. "[T]he appropriate way to enforce a forum-selection clause pointing to a state . . . forum is through the doctrine of *forum non conveniens.*" *Id.* at 60.

Under the doctrine of *forum non conveniens*, evaluating a forum-selection clause is a two-step process. **First**, the Court determines whether the forum-selection clause is "applicable to the claims at issue, mandatory, valid, and enforceable." *Lakeside Surfaces, Inc. v. Cambria Co., LLC*, 16 F.4th 209, 215-16 (6th Cir. 2021). If so, a plaintiff's "choice of forum 'merits no weight' and the courts consider arguments only under the public-interest factors, treating the private-interest factors as 'weigh[ing] entirely in favor of the preselected forum.'" *See id.* at 215 (quoting *Atl. Marine*, 571 U.S. at 63-64 (alteration in original)). **Second**, a plaintiff "bears the burden of showing that the public interest factors weigh heavily against dismissal." *Id.* at 216. Because the public-interest factors "will rarely defeat" a valid forum-selection clause, "the practical result is that forum-selection clauses should control except in unusual cases." *Atl. Marine*, 571 U.S. at 64.

*S. Welding, LLC v. Soles*, No. 3:25-CV-458-KAC-JEM, 2025 WL 3284469, at *2 (E.D. Tenn. Nov. 25, 2025).

agreement" theory was not sufficiently pled by Plaintiff.[33] This means not that the Court will not consider Plaintiff's contention that the parties' have a "handshake agreement" (i.e., oral agreement), but rather merely that Defendant can meet its initial burden without having addressed whether the parties had some contract other than the Employment Agreement. Thereafter, if Defendant meets that initial burden the Court will consider whether Plaintiff meets its resulting burden—of creating a genuine dispute of fact as to the existence of an enforceable agreement—by showing an enforceable "handshake agreement," *i.e.,* oral contact.

Defendant argues that there was no enforceable contract because the Employment Agreement was never signed by Plaintiff or Defendant and because Plaintiff was still negotiating terms of the Employment Agreement, as late as November 2, 2019—twelve days before his termination. (Doc. No. 50 at 10). In the Response, Plaintiff does not address whether the Employment Agreement is binding; rather, he focuses his argument on whether the parties had a

---

[33] Although Plaintiff alleges (in the Second Amended Complaint) that the parties had an oral agreement, he alleges that the oral agreement was followed by an employment contract, presented by Mr. Sullivan on February 14, 2019, which set out the basic terms of Plaintiff's employment. (Doc. No. 37 at ¶¶ 13, 14). There is only one document in the entire record entitled, "Employment Agreement," and that document states: "This Employment Agreement (the "Agreement") is entered into on February _____, 2019 (hereinafter, the "Effective Date") between Vignobles Sullivan USA (hereinafter, "Company" or "BAM"), and Charles McPherson (hereinafter, the "employee") . . . ." (Doc. No. 52-2 at 2).

The Court presumes that the Employment Agreement, as the only written employment contract (or potential contract) in the record, is the "contract" to which Plaintiff refers throughout the Second Amended Complaint. Under the section titled "COUNT TWO (Breach of Contract)," Plaintiff alleges that:

74. [Plaintiff] and [Defendant] had a valid and enforceable contract to pay salary, bonuses, and vacation for work performed by [Plaintiff] on [Defendant]'s behalf.

75. This contract was consistent with the parties' oral and written communications and their actions and the terms were reasonably certain.

(Doc. No. 37 at ¶¶ 74, 75). These paragraphs clearly refer to an alleged *written* contract, as Plaintiff alleges that the parties had a contract "consistent with the parties' oral and written communications." And nothing here supports the Court finding that Plaintiff sufficiently pleads in the alternative an enforceable contract based on an oral agreement).

binding contract premised on a "2018 promise"[34] and Plaintiff's eleven months of work. (Doc. No. 63 at 10-11) (Doc. Nos. 59-1 at ¶¶ 9,11-13; 59-2; 59-3).

To be an enforceable contract under Tennessee law, a contract must include sufficiently definite terms to enable a reviewing court to ascertain the parties' respective obligations. *Thorne v. Satellogic USA, Inc.*, No. 3:23-CV-00619, 2024 WL 1558707, at *5 (M.D. Tenn. Apr. 9, 2024) (Richardson, J.) (citing *Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Loc. No. 3-677*, 811 S.W.2d 875, 880 (Tenn. 1991) (noting that a contract "must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties") (quoting *Soar v. National Football League Players' Ass'n*, 550 F.2d 1287, 1290 (1st Cir. 1977)); *Elk Valley*, 832 S.W.2d at 553–54 ("If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract.") (citing Restatement (2d) Contracts § 33 (1981))). To establish a breach-of-contract claim under Tennessee law, a plaintiff must prove: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Tolliver v. Tellico Vill. Prop. Owners Ass'n, Inc.*, 579 S.W.3d 8, 25 (Tenn. Ct. App. 2019) (quoting *ARC LifeMed, Inc. v. AMC–Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).

---

[34] As best the Court can discern (relying on Plaintiff's citation of his Declaration), this "2018 promise" refers to Mr. Sullivan's offer for Plaintiff to come work from his company, Defendant:

> On or about December 14, 2018, I accepted the role of President of Vignobles Sullivan, to start on January 2, 2019. I accepted the role based on promises Sullivan made that I would receive a base salary of $175,000, would receive health insurance, would have a credit card for reasonable business expenses, would have budget allocated to hire an account executive, who would also have a credit card for reasonable business expenses, medical and dental insurance for both myself and the account executive, that I would receive bonuses of $15,000 each for establishing distributorships in the "big" markets and $5,000 for distributorships in other markets, and that I would receive equity in the company.

(Doc. No. 59-1 at ¶ 11).

Plaintiff admitted that the Employment Agreement was never signed by either party. (Doc. No. 61 at ¶¶ 47-28). However, contrary to Defendant's argument, Plaintiff did not thereby admit that there is no enforceable contract via the Employment Agreement. In Tennessee, "a written contract is not required to be signed to be binding on the parties." *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 454, 462 (M.D. Tenn. 2023) (quoting *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) (citation omitted)). *See also Kutite, LLC v. Excell Petroleum, LLC*, 780 F. App'x 254, 258 (6th Cir. 2019) (quoting *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC*, 93 S.W.3d 861, 865 (Tenn. Ct. App. 2002)). What is essential to establishing that a binding contract exists between the parties is mutual assent. *See T.R. Mills Contractors, Inc.*, 93 S.W.3d 865. The assent, it appears, can be to all the terms made in writing in a putative written agreement even if the assent is not manifested in writing (via, for example, the parties' signatures at the bottom of the putative written agreement). Via the Memorandum and the Reply, Defendant alludes to the notion that the parties did not mutually assent to the Employment Agreement in its entirety. (Doc. Nos. 50 at 10-11; 67 at 5).

To determine mutuality of assent, "courts use an objective standard based on the manifestations of the parties." *Id*. (citing 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 30:6 (4th Ed.1999)). "In other words, [the court] must determine whether a reasonable onlooker, based upon the parties' outward manifestations, would conclude that [the parties] agreed to be bound by the terms of the written contract." *Broadnax v. Quince Nursing & Rehab. Ctr., LLC*, No. W200802130COAR3CV, 2009 WL 2425959, at *3 (Tenn. Ct. App. Aug. 10, 2009) (quoting *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007) (citing *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005))). To make such a determination, the court can consider relevant evidence, such as whether

the parties performed under the contract's terms. *T.R. Mills Contractors, Inc.*, 93 S.W.3d at 866 (citing 11 Williston & Lord, § 30:3).

It is undisputed that the parties did not mutually assent to the entirety of the Employment Agreement. Plaintiff admitted in response to Fact 39 that the parties never reached a "meeting of the minds" on the Employment Agreement.[35] (Doc. No. 61 at ¶ 39). Likewise, Plaintiff admits that

_____

[35] Plaintiff partially disputes the fact asserted in Fact 39 and provides in his response as follows:

> RESPONSE: Disputed to the extent this statement is a mischaracterization of McPherson's testimony on p. 59.
>
> Q. The – and as far as your proposed changes to the commission structure as far as, you know, adding Florida and removing Delaware, was that a topic of your 12 or so conversations with Tom after February 15th?
> A. Yes.
> Q. And tell me about those conversations. What kind of back and forth did you-all have on that?
> A. My recollection was that Tom was agreeable to those changes.
> Q. So at that point then, was the main sticking point, as you saw it, kind of this back and forth you-all were having about vesting and the timing of vesting?
> A. Yes. At that time that was the only issue, and Tom didn't appear to have any real objection to making that change.
> Q. But you-all never came to a meeting of minds about that, never signed an agreement; is that right? (Pl.'s Dep. at 59).

(Doc. No. 61 at ¶ 39). Plaintiff conveniently omits his answer to counsel's last question; that answer being: "Correct." (Doc. No. 52-1 at 16 (Page 59)). It is possible that by omitting his answer Plaintiff was trying to safeguard his answer from appearing to reflect an affirmative answer to *both* portions of the compound question (Did you all come to a meeting of the minds about that? Did you all sign an agreement?) asked by counsel because (perhaps) Plaintiff did not intend for his answer to have that effect at the time he answered the question.

However, it is not for the Court to speculate as to what Plaintiff did or did not mean by his answer. Yet, it is revealing to the Court that—unlike with several other facts that Plaintiff clarifies via his Declaration—he does not address this part of his testimony, which is critical to his claim for breach of contract (in relation to the existence of mutual assent). Notably, Plaintiff did not object to this (compound) question at the time that it was asked and never distinguished one question from the other (or distinguish his answer to one question from his answer to the other question); he did so neither during the deposition, nor later in his response to Fact 39 or in the Response. And Plaintiff certainly does not expressly dispute that the parties never reached a "meeting of the minds."

Moreover, it is clear from the surrounding context that "a meeting of the minds about that" refers to mutual assent to the entirety of the Employment Agreement. Prior to this questioning by Defendant's counsel, he entered the Employment Agreement as an exhibit to the deposition. (Doc. No. 52-1 at 15 (page 57)). Almost immediately thereafter, counsel asked Plaintiff why the parties never signed the Employment Agreement, to which Plaintiff responded, "We never got it – the details hammered out." (*Id*. at 16 (page 58)). Plaintiff testified that "minor changes to the structure of the agreement" occurred over time. (*Id*.).

his initial impression of the Employment Agreement was that the parties were "very close" to a

mutual understanding. (Doc. No. 63 at ¶ 34) (citing Doc. No. 52-1 at 14 (Pages 50-51)).[36]

Furthermore, Plaintiff testified that the parties never signed the Employment Agreement because

Accordingly, the Court deems Fact 39 to be admitted by Plaintiff. Notably, such an admission is not dispositive on the issue of whether the Employment Agreement is a binding contract. However, it does assist Defendant in meeting its initial burden to show that the Employment Agreement is not a binding contract.

[36] Fact 34 provides simply that "Plaintiff reviewed the Agreement immediately and his initial impression was the parties were 'very close' to a mutual understanding." (Doc. No. 61 at ¶ 34) (citing Doc. No. 52-1 at 14 (pages 50-51)). Plaintiff partially disputes Fact 34 "to the extent that the parties were close to a mutual understanding on the terms that they had discussed in December, except that [Plaintiff] questioned the major markets and the vesting timeline and percentage in the company." (Doc. No. 61 at ¶ 34). To support his response, Plaintiff cites to his deposition testimony (as opposed to an affidavit or some other evidence in the record), wherein Plaintiff testified, in pertinent part, as follows:

> Q. Okay. So when Tom sent you this draft employment contract on February 14th, this is not the first time you reviewed a [sic] employment contract about your potential employment; is that fair to say?
>
> A. That is fair to say.
>
> …
>
> Q. Okay. When Tom sent this on the 14th, did you read it over, you know, that day or the next day?
>
> A. I believe I read it over immediately.
>
> Q. Okay. And what were your initial impressions?
>
> A. Initial impressions were that we were pretty close to a mutual understanding. I had a couple of questions about the major markets that were included in the contract, and also I had a question regarding vesting in the company.

(Doc. No. 52-1 at 14 (Pages 49-50)). Nowhere in the above testimony does Plaintiff or the questioning counsel refer to December or conversations that (purportedly) occurred in December. Plaintiff testified that he reviewed the Employment Agreement and that his "[i]nitial impressions were that we were pretty close to a mutual understanding." It is possible that Plaintiff meant to convey here that he thought the parties were pretty close to a mutual understanding because he had remaining questions *only* about "the major markets" and "vesting,"; however, this would not change that the fact the parties—being merely "close" to a mutual understanding —did not actually *have* a mutual understanding on all terms of the Employment Agreement when he reviewed it on February 14. Accordingly, the Court deems Fact 34 to be admitted.

"[he and Defendant] never got it – the details hammered out." (Doc. No. 52-1 at 16 (Page 58)).[37] The record also shows that Plaintiff continued to negotiate terms of the Employment Agreement (approximately 12 times) during 2019. (Doc. No. 67 at 6) (citing Doc. No. 52-1 at 16 (Page 58); (Doc. No. 50 at 10-11) (citing Doc. No. 61 at ¶ 74). Accordingly, Defendant has met its initial burden in showing that the Employment Agreement is not an enforceable contract.

Plaintiff attempts to rebut Defendant's showing by arguing that the parties had a "handshake" agreement (or an oral contact),[38] consisting of "2018 promises . . . coupled with the parties' actions for the next eleven months" (January 2019 to November 2019). (Doc. No. 63 at 10-11). Plaintiff argues that the existence of oral promises and conduct of the parties create terms that are sufficiently definite to be enforced. (*Id*. at 11). Tennessee law recognizes oral contracts as enforceable if the party seeking to enforce it demonstrates that: "'(1) the parties mutually assented to the terms of the contract and (2) that these terms are sufficiently definite to be enforceable.'" *Padgett v. Clarksville-Montgomery Cnty. Sch. Sys.*, No. M201701751COAR3CV, 2018 WL 5881766, at *7 (Tenn. Ct. App. Nov. 9, 2018) (quoting *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002)). "While a contract may be either expressed or implied, or written or oral, it must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Johnson v. Central Nat'l Ins. Co.*, 210 Tenn. 24, 356 S.W.2d 277, 281 (Tenn. 1962) (citing *Am. Lead Pencil Co. v. Nashville, C. &*

---

[37] Fact 48 stands for the proposition that neither Plaintiff nor Defendant ever signed a valid and enforceable employment agreement. Plaintiff admitted Fact 48 inasmuch as he admitted that the parties did not sign the Employment Agreement or any other agreement incorporating his edits. (Doc. No. 61 at ¶ 48).

[38] Plaintiff does not argue that the Employment Agreement specifically is enforceable; rather, he asserts that he "can set forth enough facts to establish that an enforceable contract [generally] existed."

*St. L. Ry.*, 124 Tenn. 57, 134 S.W. 613, 615 (Tenn. 1911)). Like written contracts, "[t]he contemplated mutual assent need not be manifested in writing; it may be manifested, in whole or in part, by the parties' spoken words or by their actions or inactions." *Id*.

To meet his burden, Plaintiff needs to create a genuine dispute as to whether the parties mutually assented to the terms of the Employment Agreement. Alternatively, if Plaintiff is (as he seems to be) arguing that a contract other than the Employment Agreement was formed, then Plaintiff needs to show via the record that (1) the terms were sufficiently defined and (2) the parties mutually assented to those exact terms. Plaintiff certainly fails to rebut the undisputed facts that the parties did not mutually assent to the terms of the Employment Agreement. Instead, proceeding with the theory of an oral contract, Plaintiff in his Declaration describes an "[oral] promise [between himself and Defendant] that [Plaintiff] would receive salary, bonus, and equity for the work [he] was performing" on behalf of Defendant. (Doc. No. 59-1 at ¶ 16). Moreover, Plaintiff argues that the parties' actions serve as evidence that an enforceable contract existed. (Doc. No. 63 at 11).

True, a reasonable jury could surmise, based on the conduct of the parties, that some sort of business relationship existed between Plaintiff and Defendant. However, the parties' conduct also includes continuing to negotiate the terms of Plaintiff's employment with Defendant. The undisputed evidence of ongoing negotiations indicates that the terms of any agreement (written or oral) were not sufficiently definite to demonstrate an objective intent to be bound. *Cf Haake v. VR Groups, LLC*, No. 19-00706-CV-W-BP, 2021 WL 12310972, at *2 (W.D. Mo. Feb. 24, 2021) (Ongoing negotiations between the parties over the terms demonstrates that there was no mutual assent, and hence, no binding settlement agreement, which like any other contract, requires objective manifestation of mutual assent to all essential terms.) (internal quotation marks and

citations omitted). A reasonable jury would have to find that the parties had the formation of a contract merely *in progress* (rather than *completed*), as terms of Plaintiff's employment remained in negotiation for almost a year and the parties did not finalize a written agreement because negotiations had not concluded prior to Plaintiff's termination. (*See* Doc. No. 63 at 10) (Plaintiff provides "[h]e accepted an offer in December 2018 based on in-person meetings with Sullivan, written correspondence about the terms, and an understanding a formal agreement would come later.")

Accordingly, the Court finds that there is no genuine dispute as to whether the parties mutually assented to a contract (written or oral), and therefore, Plaintiff's argument that an enforceable contract existed, even one beyond the Employment Agreement, is unavailing.

Even assuming *arguendo* that the parties mutually assented to an oral agreement or "handshake agreement," even if that agreement (as Plaintiff suggests) consisted of a basic agreement that Plaintiff will perform job duties as Defendant's president in exchange for a "salary, bonus, and equity," (Doc. No. 63 at 10), the record shows that the parties intended for Plaintiff's employment to be indefinite. In the absence of an agreement or contract for employment for a certain term, employees (in Tennessee) are presumed to be employed at-will. *King v. TFE, Inc.*, 15 S.W.3d 457, 460 (Tenn. Ct. App. 1999).

It is undisputed that Plaintiff agreed to a yearly increase in his salary and that any vesting was contingent on Plaintiff's continued employment for a minimum of three years (Doc. No. 61 at ¶¶ 57, 61),[39] both of which suggest that Plaintiff's employment would be ongoing. Moreover,

---

[39] The Court acknowledges that Plaintiff disputes Fact 61; however, he disputes only the assertion of the specific timing under which his right to obtain equity in Defendant would vest. (Doc. No. 61 at ¶ 61) ("Both Sullivan and I agreed that I would be eligible for equity in the company, and the only question remaining was the timing of the vesting and the percentage." (citing Doc. No. 59-1 at ¶¶ 12, 16)). Although Plaintiff argues that his employment was for a certain term, his Declaration directly undercuts that argument: "I sought to add terms to the contract that reflected additional conversations we had had throughout the year

as Defendant argues, Plaintiff admitted that the Employment Agreement provided for at-will employment and that he never asked to change the at-will nature of his employment.[40] (Doc. Nos. 50 at 11; 61 at ¶ 36).

Plaintiff seems to argue in his Response that the promise of a salary, bonus, and equity in work he performed establishes the sufficient terms to show the existence of a contract. (Doc. No. 63 at 3). A district court in Illinois determined that payment of salary calculated on an annual basis (or a promise of other forms of compensation, such as bonuses or equity) is not enough to create an employment contract for a specific duration. *See Weeks v. Distinctive Appliance Corp.*, No. 84 C 9716, 1985 WL 3536, at *2 (N.D. Ill. Oct. 24, 1985) (rejecting a plaintiff's contention that he had established a definite term of employment via the promise of an annual salary). The Court finds this determination persuasive and logically sound. Moreover, a very similar determination was reached by the Sixth Circuit Court of Appeals:

> Neither the statement of an annual rate of pay, *Henkel* [*v. Educ. Research Council of Am.*, 45 Ohio St.2d 249, 344 N.E.2d 118, 118 (1976)], nor the promise of "career advancement opportunities," *Daup v. Tower Cellular, Inc.,* 136 Ohio App.3d 555, 737 N.E.2d 128, 133 (2000) (citation omitted), such as bonuses and academic funding, modify the presumed at-will relationship. *See id.* at 133–34 (promises to develop "many other ventures together" insufficient to alter at-will employment); *Clark* [*v. Collins Bus Corp.*, 136 Ohio App.3d 448, 736 N.E.2d 970, 972-73 (2000)] (employment contract specifying annual salary and bonus with no mention of duration is an at-will contract); *Shaw v. J. Pollock & Co.*, 82 Ohio App.3d 656, 612 N.E.2d 1295, 1298 (1992) ("The potential of future profit sharing is not a fact or circumstance which transforms a contract terminable at will into a contract for a term of years."). This is so because, as the district court explained, provisions concerning bonuses, raises, and research funding per year ultimately suffer from

---

and reflected changes in the company structure that had occurred through the course of the previous eleven months and which would be applicable for *future years*." (*Id*. at ¶ 16) (emphasis added).

[40] True, Plaintiff added in his response to Fact 36 that the Employment Agreement was never signed— implying that its provisions are unenforceable. (Doc. No. 61 at ¶ 36). As with filing his suit in this Court despite the governing provision within the Employment Agreement, Plaintiff again fights to metaphorically have his cake and eat it too, by presenting the Employment Agreement as evidence of an enforceable contract, while cherry-picking what provisions of the Employment Agreement are unenforceable because the Employment Agreement was not signed by the parties.

the same defect as provisions concerning annual compensation: they "refer to how much [the employer] will support *per year*; they say nothing to guarantee employment for a specific duration."

*See Casale v. Nationwide Children's Hosp.*, 682 F. App'x 359, 364 (6th Cir. 2017).

Accordingly, a reasonable jury would have to find—in the absence of any enforceable contract (written or oral) for a certain term and fully agreed to by the parties—that Plaintiff's employment with Defendant is at-will, as no showing via the record has been made that would allow a jury to find contrary to the presumption that the employment was at-will.[41] As an at-will employee, Plaintiff cannot maintain a breach-of-contract claim. *See Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1041 (6th Cir. 1992) (holding in the absence of a contract between the employee and the employer for something more than employment terminable at will, the employee cannot maintain an action for breach of contract). *See also Forsman v. Rouse*, No. 3:07-0327, 2008 WL 2437644, at *6 (M.D. Tenn. June 16, 2008) ("By definition, at-will employment is a non-contractual, continuing business relationship.") (citing *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994) (holding that an employee's at-will status prevented a claim on breach of contract theory because he had no contractual right to continued employment)).

---

[41] In fact, as Defendant argues, evidence in the record suggests that Plaintiff had the understanding that the Employment Agreement expressly provided at-will employment, and Plaintiff made no attempts to change the nature of his at-will employment. (Doc. No. 61 at ¶¶ 36, 63, 72). During his deposition, Plaintiff testified that he understood he could leave at any time and could be terminated at any time:

Q: Okay. So you agree that you were an employee at will, right?

A: Correct.

Q. And you could leave at any time for any reason, and Tom could fire you at any time for any reason; is that right?

A. Correct.

(Doc. No. 52-1 at 19 (Pages 72-73)).

For all these reasons, Plaintiff's breach of contract claim should not reach a jury, because Plaintiff cannot show there was an enforceable contract, and he cannot overcome the presumption of at-will employment. Therefore, even in viewing the light most favorably to the Plaintiff, the Court finds (1) that Defendant has met its burden of showing an absence of evidence showing an enforceable contract existed, and (2) Plaintiff failed to create a genuine dispute of material facts to show the existence of an enforceable contract. The Court will **grant** the Motion as to Plaintiff's claim of a breach of contract.

III.     Count Three: Promissory Estoppel

Promissory estoppel is generally explained as follows: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Shedd v. Gaylord Ent. Co.*, 118 S.W.3d 695, 699 (Tenn. Ct. App. 2003) (quoting *Alden v. Presley*, 637 S.W.2d 862 (Tenn. 1982)). This may sound broad, but Tennessee courts limit their application of promissory estoppel to "exceptional cases." *BiotronX v. Tech One Biomedical, LLC*, 465 F. Supp. 3d 797, 807 (M.D. Tenn. 2020). The limits to the application of promissory estoppel have been explained as follows:

> Detrimental action or forbearance by the promisee in reliance on a gratuitous promise, within limits constitutes a substitute for consideration, or a sufficient reason for enforcement of the promise without consideration. This doctrine is known as promissory estoppel. A promisor who induces substantial change of position by the promisee in reliance on the promise is estopped to deny its enforceability as lacking consideration. The reason for the doctrine is to avoid an unjust result, and its reason defines its limits. No injustice results in refusal to enforce a gratuitous promise where the loss suffered in reliance is negligible, nor where the promisee's action in reliance was unreasonable or unjustified by the promise. The limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonable in justifiable reliance on the promise as made.

*Alden*, 637 S.W.2d at 864 (citing L. Simpson, Law of Contracts § 61 (2d ed.1965)).

To succeed on a claim of promissory estoppel, Plaintiff must establish: "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that he reasonably relied upon the promise to his detriment." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007) (citations omitted). A promissory estoppel claim is not dependent on the finding of an express contract between the parties,[42] *Engenius Entertainment, Inc. v. Herenton*, 971 S.W.2d 12, 19 (Tenn. Ct. App. 1997), but the court must first determine whether an enforceable contract exists. *Calabro v. Calabro*, 15 S.W.3d 873, 879 (Tenn. Ct. App. 1999). Promissory estoppel can be a theory of recovery that serves as an *alternative* to the theory of recovering on an express contract. *Operations Management International, Inc. v. Tengasco, Inc.*, 35 F.Supp.2d 1052 (E.D. Tenn. 1999). As a general matter, however, promissory estoppel is not a viable theory of recovery when there is a valid contract. *Jones v. BAC Home Loans Servicing, LP*, No. W201600717COAR3CV, 2017 WL 2972218, at *9 (Tenn. Ct. App. July 12, 2017).

Defendant is challenging all three elements by arguing that: there was no promise (and that any alleged promise was "one of Plaintiff's own creation") (*id*. at 13); "the parties had not reached any clear understanding on the terms of Plaintiff's employment" (*id*. at 13-14) (i.e., any promise made was ambiguous or unenforceably vague); and "Plaintiff admitted that he did not turn down any 'lucrative' opportunities" and "he was unemployed at the time" when he and Defendant discussed Plaintiff's employment (i.e., Plaintiff suffered no detriment). (*Id*. at 15). In his Response, Plaintiff argues that he gave up his business, as well as other job opportunities, in reliance on Defendant's promises (Doc. No. 63 at 14). In support of this argument, Plaintiff avers in his Declaration as follows:

---

[42] Indeed, as indicated herein, a promissory estoppel claim is precluded where there is an enforceable contract between the parties.

> I accepted the role [of President of Defendant] based on promises Sullivan made that I would receive a base salary of $175,000, would receive health insurance, would have a credit card for reasonable business expenses, would have budget allocated to hire an account executive, who would also have a credit card for reasonable business expenses, medical and dental insurance for both myself and the account executive, that I would receive bonuses of $15,000 each for establishing distributorships in the "big" markets and $5,000 for distributorships in other markets, and that I would receive equity in the company. At no point before I accepted the role did Sullivan tie the bonus payments to a requirement of one year of employment or indicate that an essential term of the contract would be employment at will.

> During [a] lunch [in September 2019], Sullivan suggested that I have the right of first refusal on the sale of any French vineyard, and he agreed during the conversation to add it as a term of employment. I relied on this promise to continue working for Vignobles and to continue to put my own reputation on the line to sell the Vignobles wine to distributors with whom I had worked or whom I knew during the course of my career in the industry.

(Doc. No. 59-1 at ¶¶ 11, 15).

In a footnote, Defendant raises a specific argument that the Court finds persuasive: "Plaintiff's at-will designation dooms any promissory estoppel claim." (Doc. No. 50 at 12, n7) (citing *Fisher v. Trinova Corp.*, 1998 U.S. App. LEXIS 26249, at *33 (6th Cir. Oct. 13, 1998)) (finding that "a promise of future benefits or [career] opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the well-established doctrine of employment at will.") (quoting *Wing v. Anchor Media, Ltd.*, 570 N.E.2d 1095, 1099 (Ohio 1991)). The Sixth Circuit has consistently upheld the finding that a promise of future benefits or career opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the well-established doctrine of employment at-will. *See e.g., Fisher v. Trinova Corp.*, No. 96-3918, 1998 WL 774111, at *9 (6th Cir. Oct. 13, 1998); *Brown v. Am. Ecology Corp.*, 117 F.3d 1420 (6th Cir. 1997).

The Sixth Circuit also recognizes a more specific holding, namely that a disaffected employee is entitled to recover on a claim of promissory estoppel only if he proves that his

employer made a *discrete promise* relating to job security. *See Downs v. Bel Brands USA, Inc.*, 613 F. App'x 515, 520 (6th Cir. 2015) ("An at-will employee can claim promissory estoppel only if she can show a specific promise of job security.") (quoting *Harris v. Burger King Corp.,* 993 F.Supp.2d 677, 691 (W.D. Ky. 2014) (applying Kentucky law)); *see also Dorger v. Allstate Ins. Co.,* No. 2:08–56–DCR, 2009 WL 1248989, at *7 (E.D. Ky. May 1, 2009) (applying Kentucky law) ("Several courts have held that promissory estoppel is available to [terminated] at-will employees, but these cases are distinguishable because they generally involve promises regarding job security.").[43] *Cf Murton v. Android Indus.-Bowling Green, LLC*, No. 1:13CV-00112-GNS-HBB, 2015 WL 3549817, at *1 (W.D. Ky. June 4, 2015) (denying a promissory-estoppel claim on the grounds that no promise was made that would alter the plaintiff's at-will employment status (citing *Brown v. Louisville Jefferson County Redevelopment Authority, Inc.,* 310 S.W.3d 221 (Ky. App. 2010) (holding that an express agreement to employ the plaintiff for a specific period of time established a claim for promissory estoppel))).

Plaintiff not does address his at-will status in relation to his claim for promissory estoppel. Instead, he argues, without record support, that his promissory estoppel claim should survive summary judgment because "he gave up his own business, gave up consulting opportunities, and gave up other job opportunities in reliance on Defendant's promises." (Doc. No. 61 at 14). Based on undisputed facts, this argument is unavailing. Multiple undisputed facts show that Plaintiff had no pending job offers prior to his acceptance of Defendant's offer; rather, these opportunities were (at best) speculative, where Plaintiff thought he could get employment if he *tried* given his experience in the industry and self-described status as a "profit center." (Doc. No. 61 at ¶¶ 68, 69)

---

[43] The Court recognizes that the cases cited above are applying Kentucky and Ohio law. But both Kentucky and Ohio—like Tennessee—carry a presumption of at-will status. It is logical to conclude that without a specific promise of job security (altering the employee's at-will status), an employee would be at-will (*i.e.,* the kind of employee that has no employment security to begin with).

(citing Doc. No. 52-1 at 9 (Page 31)). Plaintiff makes no showing that he relied on any promise by Defendant to his detriment. Sill less does he show, as is required, that this detriment was substantial in an economic sense. *Alden*, 637 S.W.2d at 864 (citing L. Simpson, Law of Contracts § 61 (2d ed.1965)). Plaintiff argues only that he did not receive the benefit of possible *future* monies that were (allegedly) promised to him. (Doc. No. 61 at 14) ("Sullivan promised [Plaintiff] the chance to build a company and knew that [Plaintiff] chose to accept the offer based on a desire to have ownership interest in the company"). Neither in the Response nor his Declaration does Plaintiff establish how Defendant's (alleged) promises of future money or future benefits induced a "substantial change of position" on Plaintiff's part or a substantial loss in the economic sense. In fact, as Defendant argues, most of these promises were either under negotiation or limited by certain contingencies. *See* Doc. No. 50 at 13 (citing Doc. No. 61 at ¶¶ 35, 37 43-45, 47). Moreover, and more importantly, none of the promises on which Plaintiff allegedly relied alter his at-will status (i.e., offering job security or employment for a specific period of time). Put another way, Plaintiff has not shown that Defendant made any specific promises that would create something besides at-will employment.

Plaintiff failed to present any evidence that would show a genuine dispute of material fact that his employment status was altered by any (alleged) promises or that he suffered a substantial loss in reliance on (alleged) promises, and therefore, a reasonable jury could at most find that Defendant promised Plaintiff continuous employment for a salary and certain future benefits, which as mentioned above does not create something beyond at-will employment.

For the reasons stated above, the Court will **grant** the Motion as to Plaintiff's claim of promissory estoppel.

## IV. Counts Four and Five: THRA Retaliation and Age Discrimination

The THRA prohibits employers from "[r]etaliat[ing] or discriminat[ing] in any manner against a person because such person has opposed a practice declared discriminatory by [the THRA] or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under [the THRA]." *Ferguson v. Middle Tennessee State Univ.*, 451 S.W.3d 375, 380–81 (Tenn. 2014) (quoting Tenn. Code Ann. § 4–21–301(a)(1)). The stated purpose of the THRA is to "[p]rovide for execution within Tennessee of the policies embodied" in Title VII of the Civil Rights Act of 1964 and other federal civil rights laws. Tenn. Code Ann. § 4–21–101(a)(1) (2011); *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996).

For the THRA to apply to a particular employer, the employer must "employ[] eight (8) or more individuals within this state, or a person acting as an agent of [the] employer, directly or indirectly." *See* Tenn. Code Ann. § 4-21-102(8). Before addressing Plaintiff's *prima facie* showing of his THRA claim, Defendant argues that Plaintiff is thwarted from bringing any claim against it under the THRA because Defendant does not have the requisite number of employees (8) to qualify as an "employer" under Tennessee Code Annotated § 4-21-102(8). (Doc. No. 50 at 15); *see Gordon v. C.B. Ragland Co.*, No. 3:24-CV-00990, 2025 WL 3623261, at *3 (M.D. Tenn. Nov. 18, 2025), *report and recommendation adopted*, No. 3:24-CV-00990, 2025 WL 3618828 (M.D. Tenn. Dec. 12, 2025) (Richardson, J.).

Relying on Sullivan's Declaration, Defendant contends that as a small start-up company, it has never employed more than four (4) employees at once (Doc. No. 51 at ¶ 75) (citing Doc. No. 52-12 at ¶ 5). Plaintiff does not dispute that Defendant on its own would not have the requisite number of employees needed for liability under the THRA; rather, he argues that under the single-

employer doctrine a reasonable jury could reach the eight-employee threshold by aggregating the number of employees of Defendant and the total number of other entities (namely, Park Street Management, F9 Properties, LLC, F9 Investments, LLC, The Zest Lab, and Cabinets to Go) who supposedly performed significant work on behalf of Defendant. (Doc. No. 63 at 21; Doc. No. 61 at ¶ 75).). Incongruously citing a case that involved neither Tennessee state law (such as the THRA) nor the single-employer doctrine, Plaintiff argues that this result is appropriate because, supposedly, "the term 'employer' is to be liberally construed to affect the remedial purposes of the anti-discrimination laws," (*Id.*) (quoting *Holland v. Mercy Health*, 495 F. Supp. 3d 582, 586 (N.D. Ohio 2020)); In support of this, Plaintiff provides the names of specific individuals whom he believes were employees of Defendant for purpose of the single-employer doctrine. (Doc. No. 59-1 at ¶ 59).

Under the "single employer" or "integrated enterprise" doctrine, which the Court herein assumes *arguendo* applies to the THRA just as it applies to federal anti-discrimination laws, two companies may be considered so interrelated that they constitute a single employer subject to liability under Title VII. *Swallows*, 128 F.3d at 993–94 (citing *Armbruster v. Quinn*, 711 F.2d 1332, 1337-38 (6th Cir. 1983), *abrogated by Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006)).[44] In

---

[44] The Supreme Court granted certiorari *in Arbaugh v. Y & H Corp.*, 544 U.S. 1031 (2005), to resolve conflicting opinions among several courts of appeals on the following question: whether Title VII's employee-numerosity requirement, 42 U.S.C. § 2000e(b), is jurisdictional or simply an element of a plaintiff's claim for relief. *Id.* at 509–10 (2006) (comparing, *e.g.*, *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 223-25 (5th Cir. 2004) (Title VII's employee-numerosity requirement is jurisdictional), *rev'd and remanded*, 546 U.S. 500, and *Armbruster v. Quinn*, 711 F.2d 1332, 1335 (6th Cir.1983) (same), with, *e.g.*, *Da Silva v. Kinsho International Corp.*, 229 F.3d 358, 361–366 (2nd Cir. 2000) (Title VII's employee-numerosity requirement is not jurisdictional), *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76–83 (3rd Cir. 2003) (same), and *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 623–624 (D.D.C. 1997) (Americans with Disabilities Act of 1990's employee-numerosity requirement, 42 U.S.C. § 12111(5)(A), resembling Title VII's requirement, is not jurisdictional)). Ultimately, finding that the metaphorical ball was in the legislature's metaphorical court, the Supreme Court, held that the threshold number of employees for application of Title VII is not a jurisdictional requirement, but rather merely an element of a plaintiff's claim.

determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel, including the power to hire and fire employees, and the power to dictate terms of employment including salaries and severance pay; and (4) common ownership and financial control. *Swallows*, 128 F.3d at 995; *Armbruster*, 711 F.2d at 1337–38.

As for what question the four factors are supposed to help the court answer, as the Sixth Circuit Court of Appeals explained it:

> [T]he appropriate standard is whether, upon review of the circumstances of the intercorporate relationship, [one person or company] exercises a degree of control that exceeds the control normally exercised by a parent corporation which is separate and distinct from the subsidiary corporate entity. When sufficient control is found, the two corporate entities may be given single employer status such that their combined number of employees will be determinative of whether they are subject to Title VII requirements.

*Armbruster*, 711 F.2d 1332, 1338.[45]

On that question, none of the four factors is conclusive, and a "yes" answer to the question does not necessarily require that all four factors be present. *See Armbruster*, 711 F.2d at 1337–38. A central concern is the extent of the defendant's control over the elements of labor relations of the various entities. *See id*.at 1337; *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1363 (10th Cir. 1993); *Rogers v. Sugar Tree Prod., Inc.*, 7 F.3d 577,

---

Important for this Court's purposes, the Supreme Court's holding does not impact the application of the *Armbruster* factors herein.

[45] *Armbruster speaks* in terms of a *parent* company and its corporate *subsidiaries* constituting a "single employer" or "integrated enterprise." Plaintiff, by contrast, apparently is talking Defendant being a "single employer" or "integrated enterprise" along with some companies that do *not* constitute corporate subsidiaries of Defendant. But the Court herein assumes *arguendo* that a defendant can be a "single employer" or "integrated enterprise" along with other entities irrespective of whether those entities are the defendant's corporate subsidiaries

582 (7th Cir. 1993); *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983). Using the first and fourth *Armbruster* factors as support, Plaintiff argues that the employees of Defendant and several other entities (namely, Park Street Management, F9 Properties, LLC, F9 Investments, LLC, The Zest Lab, and Cabinets to Go) should be viewed in the aggregate because (according to Plaintiff) Defendant and these other entities should be treated as a single employer. (Doc. No. 63 at 21).

To satisfy the first factor (interrelation of operations), Plaintiff argues that Defendant shared common workspace and common equipment with Gabriella and Cabinets to Go because it shared a warehousing facility with Gabriella and Cabinets to Go and used trucks belonging to Cabinets to Go to transport Defendant's inventory. (Doc. No. 63 at 21-22) (citing Doc. Nos. 59-1 at ¶ 25; 52-12 at 18, 26 (Pages 67, 99)). Courts have noted a variety of circumstances where separate entities are so intertwined that they amount to an interrelation of operations. *See e.g. Swallows*, 128 F.3d at 994 (citing *EEOC v. Dolphin Cruise Line, Inc.*, 945 F. Supp. 1550, 1553–54 (S.D. Fla. 1996)) (Interrelation of operations also exists when "two companies provided exclusive services to each other, were marketed as twin operations, used each other's logo and letterhead interchangeably, issued checks on each other's behalf, and kept business and personnel records at the same office."); *EEOC v. Care Ctrs. Mgmt. Consulting, Inc.*, 942 F. Supp. 2d 771, 779 (E.D. Tenn. 2013) (noting that the fact that "two entities set forth a shared principal address . . . shows there may be common or interrelated aspects to their operations."); *EEOC v. Indi's Fast Food Rest. Inc.*, No. 3:15-cv-590, 2016 WL 7473130, at *3 (W.D. Ky. Dec. 28, 2016) (finding that using the same logo and similar advertising suggests interrelation). Here, the Court does not find that sharing a warehouse or using another entity's trucks amounts to an adequate showing that Defendant and Gabriella and/or Cabinets to Go have an interrelation of operations.

What Plaintiff argues is a scintilla of evidence, which is not an adequate showing that would create a genuine dispute as to whether an interrelation of operations is present (e.g., shared banking or payroll or headquartered in the same office). Plaintiff's showing also fails to address the other entities—those besides Gabriella and Cabinets to Go—that Plaintiff claims should be considered as a single employer, together with Defendant. Plaintiff has not done the analysis with Defendant and *every* entity he claims should be considered so interrelated as to constitute a single employer. *Swallows*, 128 F.3d at 994 (collecting cases).[46]

Under the fourth factor (common ownership), Plaintiff—relying on his own declaration and Sullivan's deposition testimony—argues that common ownership exists here because (according to Plaintiff) Sullivan owns Defendant and owns (or manages) the following companies: Grapevine Partners of America, LLC, Park Street Management, F9 Properties, LLC, F9 Investments, LLC, The Zest Lab, and Cabinets to Go. (Doc. No. 63 at 21) (citing Doc. Nos. 59-1 at ¶ 25; 52-12 at 18, 26 (Pages 67, 99)). Plaintiff has not shown that Sullivan is the sole owner of each of these entities. Indeed, the parts of the record relied on by Plaintiff do not support the argument that Sullivan owns or manages all of these entities. The cited portion of Sullivan's deposition testimony actually casts doubt on whether Sullivan owns Zest Lab, as his testimony is that he does not know who or what owns (or owned) Zest Lab. (*See* Doc. No. 52-12 at 21 (Page

---

[46] *See, e.g., Armbruster*, 711 F.2d at 1338 (finding interrelation of operations where parent company "handled" subsidiary's accounts receivable and its payroll and cash accounting, provided it with administrative backup, monitored its sales shipments, allowed subsidiary's managerial employees to use its company credit cards, and housed subsidiary's bank accounts at its headquarters); *McKenzie v. Davenport– Harris Funeral Home*, 834 F.2d 930, 933–34 (11th Cir. 1987) (parent and subsidiary companies were marketed as "twins in service," and parent kept subsidiary's books and records, issued its payroll checks and paid its bills); *EEOC v. Dolphin Cruise Line, Inc*., 945 F. Supp. 1550, 1553–54 (S.D. Fla. 1996) (two companies provided exclusive services to each other, were marketed as twin operations, used each other's logo and letterhead interchangeably, issued checks on each other's behalf, and kept business and personnel records at the same office).

99)).[47] Likewise, Plaintiff's Declaration does not support the notion that Sullivan owns all these entities; Plaintiff via his Declaration lists thirteen individuals whom he purports are Defendant's employees but then for ten of those thirteen individuals, Plaintiff identifies an entity other than Defendant as the employer, without any supporting facts that would indicate which defendant is the true employer of those individuals. (Doc. No. 59-1 at ¶ 25). Even if a reasonable jury somehow could find that employees of Gabriella and Cabinets to Go should (as a single employer with Defendant) be aggregated with employees of Defendant, Defendant—according to Plaintiff's Declaration—still would not have the requisite eight employees needed to be held liable under the THRA. (*See* Doc. No. 59-1 at ¶ 25).

Lacking evidence in the record, Plaintiff cannot meet his burden of creating a genuine dispute as to whether a reasonable jury could aggregate the employees of Defendant and other entities under the single-employer doctrine. Consequently, a reasonable jury would have to find that Defendant does not have eight employees, and by not having the requisite number of employees under the THRA, Defendant cannot be held liable under the THRA. *See* Tenn. Code Ann. § 4-21-102(5). As such, the Court declines to consider either of Plaintiff's claims (age discrimination and retaliation) under the THRA.

For this reason, the Court will **grant** the Motion on Counts Four and Five.

---

[47] Sullivan via his declaration (which existed as part of the record at the time Plaintiff submitted the Response) attested that: "Defendant is wholly owned by F9 Investments, LLC" (Doc. No. 52-13 at ¶ 3), but that prior to forming Defendant in 2019, Sullivan imported wine via Grapevine Partners of America, LLC and BAM Vineyards, USA, LLC, wholly owned by F9 Investments, LLC (i.e., Sullivan). (*Id*.). After the formation of Defendant, both Grapevine and BAM essentially phased out. (*Id*.).

Even if the Court accepted as true Sullivan's account of his ownership, Sullivan's ownership in the aggregate still would implicate fewer than eight employees, according to Plaintiff's Declaration, which lists two employees for Defendant and one employee for F9 Investments, LLC. (Doc. No. 59-1 at ¶ 25).

<u>CONCLUSION</u>

For the reasons stated above, the Court finds with respect to each and every one of Plaintiff's claims that there exists no genuine issue of material fact and that Defendant is entitled to judgment as a matter of law. Accordingly, Defendant's Motion (Doc. No. 49) will be **GRANTED** in its entirety.

An appropriate corresponding order will be entered separately.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE